IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRET ADAMS,**

        **Plaintiff,**

    v.                                    Civil Action 2:13-cv-894
                                               Magistrate Judge Jolson

**GEORGE KARL,**

        **Defendant.**

**OPINION AND ORDER**

This is an action for breach of contract in which Plaintiff Bret Adams alleges that Defendant George Karl failed to pay for professional services rendered by Plaintiff pursuant to the parties' alleged oral contract. With the consent of the parties, *see* 28 U.S.C. § 636(c), this matter is before the Court for decision following a bench trial conducted on November 8, 2016. In rendering its decision on this matter, the Court has considered the testimony of the witnesses and the documents admitted into evidence. For the reasons set forth below, the Court finds in Defendant's favor.

    **I.**     **BACKGROUND**

In this case, Plaintiff brings a breach of contract claim and alleges that Defendant has failed—and continues to fail—to pay him $10,000 per month due under the parties' oral contract. (Doc. 1). In Defendant's answer, he acknowledged an informal agreement to pay Plaintiff on a monthly basis but denied the existence of the contract described by Plaintiff. (*See* Doc. 15). On January 18, 2016 and January 19, 2016, respectively, Defendant and Plaintiff filed motions for summary judgment. (Docs. 100, 101). Magistrate Judge King, holding that "the record present[ed] genuine issues of material fact," denied both motions on August 3, 2016. (Doc. 107).

The sole claim pending before the Court is Plaintiff's breach of contract claim against Defendant. (*See* Docs. 28, 63). This case was reassigned to the undersigned on August 15, 2016. (Doc. 109). On November 8, 2016, the Court held a one-day bench trial, solely on the issue of liability.

### A. The Parties

Plaintiff is a formerly licensed attorney in the state of Ohio who has practiced sports and entertainment law since 1984. (Tr. 14:5-17; Doc. 1 at 2). Defendant is a professional basketball coach in the National Basketball Association ("NBA"). (Doc. 1 at 1). The two met approximately twenty-five years ago when they both invested in a company that promoted an oversized training basketball. (Tr. 14:18-20; Doc.119-1, PAGEID#986). Over time, their relationship evolved both personally and professionally. In his July 2015 deposition, Plaintiff testified that he served as Defendant's friend, attorney, agent, and business partner. (Doc. 119-1, PAGEID#987). At trial, Defendant stated that "[Plaintiff] was my financial adviser, my legal adviser, my insurance adviser, my speaking adviser." (Tr. 82:14-15). For his part, Plaintiff described the relationship over this twenty-year period as "very, very, very close." (Tr. 54:18-19).

Although the parties struggled to articulate whether Plaintiff was Defendant's agent, attorney, or both, what is clear is that Plaintiff wore many hats in his relationship with Defendant. Plaintiff had the authority to make decisions in terms of how to prioritize Defendant's financial responsibilities (Doc. 119-1, PAGEID#999); he paid Defendant's bills (Tr. 55:15-20); he served as *de facto* in-house counsel for Defendant by hiring outside counsel for various matters (Tr. 34:20-35:12); he had Power of Attorney over Defendant from May 2004 through August 2012 (Doc. 119-1, PAGEID#1285, 1288; Tr. 55:25-56:2); and he was involved

2

in negotiating professional basketball employment contracts on behalf of Defendant. (Tr. 94:12-15).

### B. Fee Arrangement

Through much of their relationship, Defendant paid Plaintiff a monthly fee for what Defendant claims were the array of services Plaintiff provided. (*See* Tr. 41:23-42:2; 97:13-21). The payments initially began at $5000 per month, rose to $7500, and finally became $10,000. (Doc. 119-1, PAGEID#990-91). The increase to $10,000 took place somewhere in the time frame of 2005–2006. (*Id*.; Tr. 84:4-22). At trial, Defendant testified as to the reason he paid Plaintiff a monthly fee:

> I paid him a monthly stipend because I thought that was easier for me, to take care of all my legal problems and relationship situations that I need a negotiator of a bank loan; you know, I went through a divorce; I went through a trust, building a trust fund; these are things that still scare me today, and I don't understand, and I need advice, both financially and legally.

(Tr. 97:15-21). In contrast, Plaintiff testified the monthly compensation was solely for his services as Defendant's agent. (Tr. 20:4-8; 41:2-17). As such, Plaintiff testified that his theory is that every time he negotiated an employment contract on behalf of Defendant, "it extended [the] original agreement" to pay him $10,000 per month. (Tr. 46:2-19). In other words, Plaintiff testified that he believed he was entitled to $10,000 a month for so long as there was an employment agreement between Defendant and an NBA team in place that Plaintiff had negotiated. (Tr. 25:22-26:10; 48:25-49:3; Doc. 119-1, PAGEID#1313-14). When pressed on the terms, Plaintiff further explained that the agreement "[w]as always to pay through the term of the contract. So, if the contract is the deferred payment spread out over how many years, I would be paid that $10,000 amount because the work was done at the time the contract was negotiated." (Tr. 26:6-10). Plaintiff claimed this was logical because not only was it standard in the industry,

3

but if things did not work as he explained, "any agent could go negotiate a contract, get fired the next day, and have no liability to be paid." (Doc. 119-1, PAGEID#1307; *see also* Tr. 18:9-14).

Plaintiff further testified that there was only one "contract" in place between the parties, meaning he was not paid for any services outside the agency relationship. (Tr. 41:20-22). The parties agree that they never had a written fee agreement. (Tr. 46:20-47:3; Tr. 98:6-8; Doc. 119-1, PAGEID#1313-14). In addition, neither party discussed the terms of the alleged agreement or what a potential termination of the underlying NBA contract would mean. (Tr. 98:9-14; *see also* 52:16-19).

### C. The Agency Relationship

Plaintiff testified that his "agency" relationship with Defendant began in 1998 after Defendant's termination with the Seattle SuperSonics, an NBA team. (Tr. 14:24-15:8). In particular, Plaintiff testified that he was involved in the buyout of Defendant's contract and dealt with subsequent fines imposed on Defendant by the NBA. (*Id.*). Following Defendant's termination from the Seattle SuperSonics, Plaintiff aided Defendant in securing an initial contract with the NBA's Milwaukee Bucks and later aided in negotiating the subsequent extension with that team in 2001. (Tr. 15:8-15; Pl. Ex. 3). On January 27, 2005, following his termination from the Milwaukee Bucks, Defendant signed an employment agreement with the Denver Nuggets, another NBA team. (Def. Ex. A). Plaintiff testified that he "assisted with this original agreement." (Tr. 17:25-18:3). In contrast, Defendant testified at trial that Plaintiff had not negotiated any of his contracts. (Tr. 80:10-15; *but see* Doc. 102, PAGEID#712 (Defendant stating in his deposition that "Bret has negotiated a lot of my NBA contracts.")).

On March 7, 2011, Plaintiff was involved in the negotiation of Defendant's contract extension with the Denver Nuggets, which was set to run from July 1, 2011 through June 30,

2014.  (Def. Ex. E; Tr. 21:14-18).  The three-year contract guaranteed Defendant an annual salary with half of his compensation paid in the fiscal year negotiated and the other half deferred over a period of three years.  (Def. Ex. E; Tr. 22:16-21).  For example, in the initial contract term (2011–2012) Defendant was to be paid $4 million dollars.  (Def. Ex. E).  However, under the deferred compensation scheme negotiated, the Denver Nuggets paid Defendant $2 million during the 2011–2012 season and deferred the additional $2 million until 2014–2015.  (*Id.*).

### D. The Fallout

Plaintiff received his $10,000 monthly stipend until August 2012.  (Tr. 31:1-6).  More accurately stated though, Plaintiff paid himself his $10,000 salary by nature of having full and total control of Defendant's finances and a signature stamp which he used to "sign" the checks he issued to himself.  (Tr. 55:21-57:16; Tr. 99:16-17).  Financial records show that $10,000 was paid to Plaintiff for "Management Fees" in the months leading up to August 2012.  (Def. Ex. F; Tr. 56:21-23).  At trial, a financial ledger showed Plaintiff issued two $10,000 checks to himself in June 2012—one on June 5, 2012, and again on June 29, 2012.  (Def. Ex. F; Tr. 27:7-17).  When questioned on cross-examination about the two payments, Plaintiff explained payment "wasn't always on the 1st or the 31st."  (Tr. 58:10-12).

On August 23, 2012, Plaintiff's Power of Attorney was revoked and Plaintiff's legal services with Defendant concluded.  (Def. Ex. H; Tr. 89:6-9; Doc 119-1, PAGEID#1325). Following the termination, Plaintiff presented evidence that he received $7500 for the months of August and September 2012. (Def. Exs. G; J).  More specifically, evidence at trial showed that on August 31, 2012, Plaintiff was issued a $7500 check for his September management fees. (Def. Ex. J).  During cross-examination, though, it was shown that Plaintiff also issued himself a check from the Adams-Karl investment account in the amount of $7500 for "Sept. Fees."  (Def.

Ex. T; Tr. 65:5-7). Plaintiff denied he was paid twice for his services to Defendant in September. (Tr. 65:8-12).

When asked about the reduction to his monthly payment from $10,000 to $7500, Plaintiff testified it was not agreed upon and instead was the result of Defendant "trying to serve two masters at the time:" Plaintiff, and Defendant's life partner at the time, Kim Van Deraa. (Tr. 30:9-23). Ms. Van Deraa, according to Plaintiff, was putting "a tremendous amount of pressure" on Defendant to eliminate the payments. (*Id.*). Plaintiff further testified though that the $7500 payments were supplemented by Defendant so Plaintiff still received his $10,000 salary without Ms. Van Deraa's knowledge. (Tr. 12-15; Tr. 60:20-24). No records related to the $2500 supplement were presented to the Court.

Neither party remembers specifically whether payments were made by Defendant in the months of October, November, and December 2012, and no evidence was presented to the Court that such payments existed. (Tr. 32:10-16; 86:12-22). Curiously though, Plaintiff does not allege breach until January 2013. (Tr. 55:7-10). In May 2013, Defendant ended any continuing employment relationship with Plaintiff. (Doc 100-3, PAGEID #564-65).

On June 7, 2013, Defendant's employment with the Denver Nuggets was terminated. (Def. Ex. Q). At the time of termination, a year remained on Defendant's contract, meaning he would continue to draw a salary from the team even though he would no longer be coaching. (*See* Def. Ex. E). Moreover, as a result of the deferred salary provision in his contract, Defendant still receives compensation and will continue to do so through June 2017. (Tr. 87:25-88:2). Plaintiff's testimony indicated that the crux of his claim is that as long as Defendant is receiving compensation from the Denver Nuggets, he should continue to receive his $10,000

6

salary, on account of the fact that he was responsible for negotiating the contract. (Tr. 25:22-26:10).

It is also worth noting that on multiple occasions Plaintiff alleged he was entitled to payments from Defendant through the 2018 NBA season. (*See* Doc 1; Doc. 119-1, PAGEID#1303,1321; Doc. 101-1, PAGEID#594). However, the Denver Nuggets contract at issue continues only through the 2017 season, not the 2018 season. (*See* Def. Ex. E). At trial, Plaintiff stated he had made a "mistake" and corrected his claim by saying he believed he should only receive compensation through the 2017 NBA Season. (Tr. 78:3-11).

## II. CONCLUSIONS OF LAW

### A. Plaintiff's Burden

Under Ohio law, which the parties do not dispute applies, Plaintiff bears the burden of proving (1) the existence of a contract; (2) performance on the part of Plaintiff; (3) breach by Defendant; and (4) damages "in order to be successful on a breach of contract claim, oral or written." *Shaffer v. Triple Diamond Excavating*, 2010-Ohio-3808, ¶ 18, 2010 WL 3211997 at *3 (Ohio Ct. App. 2010); *see also Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). Accordingly, whether the oral agreement at issue even amounts to a contract is the first step in this Court's analysis. *Spoerke v. Abruzzo*, 2014-Ohio-1362, ¶ 29, 2014 WL 1350143, at *4 (Ohio Ct. App. 2014) ("The existence of an enforceable contract is a prerequisite to a claim for breach of contract.").

"The burden of proof on one seeking to enforce an oral contract requires that party to prove the existence of the contract by clear and convincing evidence," rather than the usual preponderance of the evidence standard applicable in most civil cases. *Bumgarner v. Bumgarner*, 2010-Ohio-1894, ¶ 20, 2010 WL 1730018, at *3 (Ohio Ct. App. 2010); *see also* 84

Ohio Jur. 3d Specific Performance § 133. Ohio Courts apply "this heightened burden because oral contracts are disfavored." *Ramun v. Ramun*, 2014-Ohio-4440, ¶ 26, 2014 WL 4977495 (Ohio Ct. App. 2014); *see also Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 15 (2002). As a result, Plaintiff has the burden of proving the oral contract "by such clear and convincing oral proof as will amount in effect to a written document." 84 Ohio Jur. 3d Specific Performance § 133. Even if the Court did not apply this "heightened burden," and instead relied on the preponderance of the evidence standard, it would reach the same result—Plaintiff has failed to meet his burden in this case.

### B. Plaintiff Failed to Meet His Burden

Here, to prove the existence of the alleged contract, Plaintiff needed to prove that both parties consented to its terms; there was a meeting of the minds of both parties; and the contract was definite and certain with respect to its essential terms. *See Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134, 137 (1991) (internal citations omitted); *Shaffer*, 2010-Ohio-3808, ¶ 21; *see also Kostelnik,* 770 N.E.2d 58, ¶ 16 ("A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."). Put another way, "a party cannot be bound to a contractual obligations unless the character of his obligations is fixed with some certainty." 17 Ohio Jur. 3d Contracts § 40. Under Ohio law, the essential terms of a service contract include the identity of the parties to be bound and the subject matter of the contract. *See, e.g.*, *Nilavar v. Osborn*, 127 Ohio App.3d 1, 13, 711 N.E.2d 726, 734 (Ohio Ct. App. 1998). "And as to the essential terms, the contract must be specific." *Schlaegel v. Howell*, 2015-Ohio-4296, 42 N.E.3d 771, ¶ 17 (Ohio Ct. App. 2015) (citing *Scotts Co. v. Cent. Garden & Pet Co.,* 403 F.3d 781, 788 (6th Cir. 2005) (holding that "an agreement lacking terms specific enough to be enforced falls short of the Ohio

standard for a valid contract")). If these essential terms are definite, certain, and specific, only then may a court "fashion less essential terms that were omitted, in order to reach a fair and just result." *Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991) (citing *Litsinger Sign Co. v. Am. Sign Co.*, 11 Ohio St.2d 1, 227 N.E.2d 609 (1967)).

The Court has no doubt that some agreement existed between Plaintiff and Defendant. They had been friends for over two decades, and entwined within that friendship was an agreement in which Defendant paid Plaintiff a monthly sum. The question for this Court, however, is not whether an agreement existed—but whether the agreement Plaintiff alleges existed.

Plaintiff argues the $10,000 monthly payments were for his role as Defendant's agent alone. In contrast, Defendant explains the payments were for the variety of services provided by Plaintiff. On balance, the record supports Defendant's interpretation of the parties' agreement. First, the monthly checks themselves were recorded as "Management Fees," supporting Defendant's position that the payments were for much more than agency fees. Perhaps even more harmful to Plaintiff is his allegation that only one contract exists. (Tr. 41:20-22). It is hard to imagine that Plaintiff managed Defendant's finances, paid his bills, hired outside counsel, and provided legal services to Defendant free of charge. Plaintiff managed most aspects of Defendant's life—common sense dictates he would be compensated for that. Moreover, no evidence was presented that the payments to Plaintiff were solely related to Plaintiff's involvement in the negotiation of the Denver Nuggets contract. Without the subject matter of the contract being specifically articulated and agreed on by the parties, Plaintiff fails to prove a meeting of the minds on the essential terms. *See Nilavar,* 711 N.E.2d 726, 733-34.

Although Ohio law allows courts to "fashion less essential terms" that may have been omitted, the Court would not even know where to begin. Neither party could accurately state when the agreement began, when or how often it was extended, or how it could be terminated—if at all.  When pressed on hypotheticals regarding potential termination, Plaintiff had no answer:

> Q: "[I]f [Defendant] quit or was fired for cause and his payments from the Nuggets ceased, would he be relieved of his obligation to pay you?
>
> A: I am not sure.  We never got to that bridge.  But I think if he quit, he would still have a legal obligation to pay me, but that's pure speculation."

(Tr. 50:7-12).  Plaintiff theorizes that as long as Defendant had an employment contract in place (that Plaintiff negotiated) he should receive his monthly salary.  However, if Defendant no longer has an employment contract, a strong argument could be made that Plaintiff should not receive compensation.  The hypothetical thus illustrates the ambiguity of the agreement.

The amount to be paid monthly under the agreement and the timing of that payment were equally unclear.  Although Plaintiff suggests that $10,000 was the set fee, he testified that at the outset of the relationship he was paid less and offers no evidence as to when or how the "agreement" was amended.  Moreover, evidence at trial showed Plaintiff was paid only $7500 in August and September 2012.  Plaintiff claims Defendant "was continuing to pay [him] the $10,000 fee without Kim being aware of the payment" and "pa[id] the difference" between the former $10,000 salary and the new $7500, but Plaintiff presented no evidence of this fact beyond his own testimony.  (Tr. 30:2-9; *see also* Tr. 12-15; Tr. 60:20-24).  In terms of the timing, the ledger introduced at trial demonstrates that the $10,000 payment was issued on the whim of Plaintiff, since he testified that no set payment schedule existed. (Def. Ex. F; Tr. 27:9-21; 58:10-12).  The difference in payments and inconsistency of when the payments were made indicates the agreement's fluidity, as opposed to its definitiveness.

As further proof of the lack of specificity of the contract, Plaintiff himself did not have a firm grasp on the duration he was alleging.  On multiple occasions, he alleged that he was to be paid by Defendant through the 2018 NBA season and thus was entitled to $720,000 in damages. (*See* Doc 1; Doc. 119-1, PAGEID#1303, 1321; Doc. 101-1, PAGEID#594).   However, as Plaintiff acknowledged at trial, the Denver Nuggets contract at issue continues only through only the 2017 season, not the 2018 season.

Plaintiff stressed, in an apparent attempt to argue the length of the agreement was clear, that it is standard in the industry "that the agent is paid through the duration of the contract and its employment term."  (Tr. 36:20-37:1).  Plaintiff continued by testifying that "in the agency business, all agents are paid pursuant to the contract" and thus should be paid for the duration of the contract they negotiated. (Tr. 18:9-14).  "Otherwise, if they are not," Plaintiff argued, agents would "negotiate the contract and [if the client] get[s] terminated the next day," the agent would not "receive[] any compensation."  (*Id.*; *see also* Doc. 119-1, PAGEID#1307 (stating that "under your asinine theory, any agent could negotiate a contract, get fired the next day, and have no liability to be paid.  How does that make any sense? How does that make any sense whatsoever.")). Plaintiff's testimony at trial and in his deposition repeatedly contained statements like "this is standard in the industry," (Tr. 36:24-37:1; 41:4-5) and "[i]t's standard in the business" to do things this way. (Doc. 119-1, PAGEID#992).  No evidence beyond Plaintiff's testimony was offered to support this theory.  Plaintiff's testimony standing alone is not enough to convince the Court that this is "industry standard"— or what Plaintiff did here is in line with that standard.

In sum, while some sort of agreement may have been reached, the burden to establish the existence of the oral contract that Plaintiff alleges falls on him.  Plaintiff had to show that there

11

was a meeting of the minds and both parties consented to the terms of an oral contract, in which Plaintiff's monthly compensation from Defendant was solely for negotiating the Denver Nuggets contract and was intended to last for the entire period during which Defendant collected his deferred earnings.  Plaintiff failed to meet that burden.

### III.  CONCLUSION

For the reasons set forth above, the Court hereby finds in favor of Defendant on the breach of contract claim.  This being the sole remaining claim, the clerk is directed to enter JUDGMENT in favor of Defendant and against Plaintiff. The bench trial set for January 17, 2017, to determine damages is no longer necessary, and is therefore VACATED.  This case is TERMINATED.

IT IS SO ORDERED.


Date:  December 13, 2016                         /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE